Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Michael T. Mason | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 98 C 8002 | DATE | 10/31/2001 |
| CASE TITLE | Billy Wardell & Donald Reynolds vs. City of Chicago | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: Defendant City of Chicago's motion for summary judgment [83-1] is granted in its entirety. All remaining pending motions [75-1, 76-1, 86-1, 88-1, 110-1, 110-2] are denied as moot. Judgment is entered in favor of defendant City of Chicago and against plaintiffs Billy Wardell and Donald Reynolds.
(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | Document Number |
|---|---|---|---|
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | OCT 31 2001 | |
| | Notified counsel by telephone. | date docketed | |
| | Docketing to mail notices. | | |
| ✓ | Mail AO 450 form. | docketing deputy initials | 116 |
| | Copy to judge/magistrate judge. | 10/31/2001 date mailed notice | |
| KF | courtroom deputy's initials | 01 OCT 31 PM 1: 16 Date/time received in central Clerk's Office | KF mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| BILLY WARDELL and DONALD REYNOLDS, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) 98 C 8002<br>) |
| CITY OF CHICAGO, et.al. | )<br>) |
| Defendant. | )<br>) |

**DOCKETED OCT 31 2001**

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Before us is defendant City of Chicago's ("City") motion for summary judgment against plaintiffs Wardell and Reynolds. The plaintiffs have accused the City of withholding a purportedly exculpatory police department crime lab report from the attorneys who defended the plaintiffs in their criminal trial for sexual assault. The plaintiffs were found guilty at trial and spent eleven years in prison before they were exonerated by later DNA tests. The City argues that it did in fact turn over the disputed lab report prior to trial, and that in any event, the report was not exculpatory. For the following reasons, we grant the City's motion in its entirety.

## Legal Standard

We may grant a motion for summary judgment only if there are no genuine disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Factual disputes are "'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the [non-movant],'" and are "'material' only when they 'might affect the outcome of the suit under the governing law.'" *Oest v.*

//6

*Ill. Dep't of Corrections,* 240 F.3d 605, 610 (7th Cir. 2001) *quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In opposing a motion for summary judgment, the non-movant may not rest on the pleadings, but must adduce evidence "set[ting] forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). The non-movant must create more than mere doubt about the material facts, See *Albeiro v. City of Kankakee,* 246 F.3d 927, 932 (7th Cir. 2001), and cannot prevail by relying on a scintilla of evidence or mere speculation to support his position. See *Patterson v. Chicago Ass'n for Retarded Citizens,* 150 F.3d 719, 724 (7th Cir. 1998).

**Facts**

The following facts are undisputed pursuant to the parties' Rule 56.1 statements, except where noted. Plaintiffs were arrested and charged with sexual assault in May, 1986. At trial in 1988, the victims identified Wardell and Reynolds as their attackers; they were found guilty and sentenced to prison. At the criminal trial, Wardell and Reynolds' public defenders did not make use of a City police department lab report prepared by technician Maria Pulling (the "Pulling report"), which concluded that certain hairs found in the underwear of Reynolds did not match those of the victims. The plaintiffs contend that the City purposely withheld the Pulling report from both the prosecutors and defense attorneys so that it could not be utilized at trial. Further, plaintiffs argued that the Pulling report actually encompasses seven pages – two typed pages and five pages of handwritten notes – and not only the two typed pages recognized by the City. The plaintiffs contend that had the Pulling report been produced in its entirety to the public defenders, they would have recognized its

2

exculpatory nature and successfully used it at the criminal trial to obtain a not guilty verdict for their clients.

The plaintiffs contend that the City is liable for the failure to produce the lab report because it has a policy and custom of concealing exculpatory evidence from criminal defendants, particularly African-Americans, and that it also deliberately failed to train employees of the City's crime lab in the correct procedures for creating and disclosing exculpatory lab reports.

The bulk of the City's Rule 56.1 statement is dedicated to demonstrating that it did in fact turn over the Pulling report to the State's Attorney's office prior to Wardell and Reynolds' trial, that the State subsequently turned the report over to Wardell and Reynolds' public defenders,[1] and that in any event, the report was not exculpatory. Both sides set forth evidence and argument in an attempt to demonstrate or destroy a paper trail that traces the Pulling report from its creation on June 17, 1986, to its alleged provision to the State's Attorney on August 4, 1986. Complicating the matter is the fact that in 1987, the crime lab file that contained the Pulling report was reduced to microfilm, and the parties argue about whether it is possible to determine whether this file – a copy of which is currently in the possession of the State's Attorney – was produced to that office before or after the microfilming was completed. The State's Attorney's copy of the crime lab file includes several copies of the two page Pulling report, which does not contain microfilm tracking numbers at the top of each page. If

---

[1] As the City points out, it only needs to demonstrate that it produced the Pulling report to the State's Attorney; it is not liable if the State's Attorney failed to then turn it over to Wardell and Reynolds' public defenders.

3

the State's Attorney's office got the file prior to it being filmed in 1987, (as the City argues that the lack of microfilm numbers on the lab file demonstrates), it received the file before Wardell and Reynolds' 1988 trial. If this scenario is true, the City fulfilled its duty, with one caveat we explain below.[2]

After examining the evidence and the parties' 56.1 statements and responses, we find that there is no material dispute that the City did in fact turn over the June 17, 1986 two-page typed lab report by Maria Pulling. First, it is undisputed that on July 16, 1986, Assistant State's Attorney Kevin Durkin requested the Chicago Police Department reports pertaining to the Wardell and Reynolds criminal case. His notes from that request indicate that Pulling would be sending over her report to him separately and that another lab employee, Pamela Fish, was "working up" her serology report as well.[3] On August 4, 1986, in open court, Durkin tendered copies of the police reports he had received from the crime lab to Wardell and Reynolds' public defenders. Included in this tender was a two-page lab report dated June 3 (the Fish serology report) and, according to the transcript, "another two-page laboratory report." As of August 4, 1986, the only two lab reports in existence were those by Fish and Pulling.

---

[2] If the State's Attorney's office got a copy of the lab file, the Office of the Public Defender should presumably have a copy of the lab file as well, but that office has thus far been unable to locate any of its files related to the criminal case.

[3] In disputing this fact, plaintiffs state that Durkin's notes merely say "trace unit, Maria Pulling - sending report," and argue without support that this does not prove Durkin planned to receive the Pulling report shortly. We cannot imagine any other logical interpretation of these notes other than Durkin's belief that the Pulling report would be sent to him by Pulling herself.

4

Thus, it follows that Durkin turned these two reports over to the public defenders on August 4, 1986.[4]

Additionally, we note that the State's Attorney's copy of the police file contains at least three copies of the Pulling report (and multiple copies of the Fish report as well) and that none of these reports bear any microfilm tracking numbers, indicating, as we explained above, that these documents were turned over to the State's Attorney prior to 1987, when the file was reduced to microfilm. We cannot credit plaintiff's expert, Elizabeth M. Biestek, who opines that without examining the actual pages, it is impossible to determine whether they have been tampered with, i.e., had their microfilm numbers erased. Expert evidence must be both relevant and reliable to the matter being discussed. See Daubert v. Merrill Dow Pharmaceuticals, 509 U.S. 579 (1993), that it, it must be "helpful" to the trier of fact; the judge acts as a gatekeeper in deciding whether a particular expert's opinion is helpful. Id. The opinion of Biestek – who did

---

[4] In rebuttal, the plaintiffs point out that also on August 4, 1986, Durkin filed the State's Answer to discovery in court, which listed the names of all potential witnesses, and that Pulling's name is not listed, leading to their contention that her report was not tendered. This argument fails for several reasons. First, in addition to listing by name various potential witnesses, the Answer also indicates that "Personnel from Crime lab, (and) any person named in police reports, arrest reports, inventory sheets, medical reports, laboratory reports,. . ." were potential witnesses. Pulling was both "personnel from the crime lab" as well as "named in a lab report", and thus identified as a potential witness. Further, Pam Fish's name also does not appear on the typed Answer, but is handwritten at the top of the page with several other names. None of the evidence produced by either party indicates who made these handwritten notes or when they were made, and so they are unauthenticated and we do not credit them. Woods v. City of Chicago, 234 F.3d 979, 989 (7th Cir. 2001). Finally, although the plaintiffs stress the fact that two copies of the Fish report appear in the State's Attorney's files and thus contemplate Durkin must have tendered two copies of that report on August 6, 1986, in fact, at least three copies of the Pulling report appear in the State's Attorney's file as well.

not even examine the documents at issue, but instead makes a general statement that they <u>could</u> have been tampered with – does not rise to the level of relevance or reliability required for expert opinions under *Daubert*. *See also Weigel v. Target Stores*, 122 F.3d 461, 469 (7th Cir. 1997) *citing American Int'l Adjustment Co. v. Galvin*, 86 F.3d 1455, 1464 (7th Cir. 1996) (An expert's opinion based on 'unsupported assumptions' and 'theoretical speculation' is no bar to summary judgment).[5]

So if the parties were in agreement that the Pulling report only constituted two pages, we would have nothing else to decide. However, we do find a genuine question of fact about whether the Pulling report constituted two pages, as the defendants contend, or if it also included the five pages of handwritten notes created by Pulling at the same time. None of the evidence adduced demonstrates when or if these other pages were turned over to the prosecution or defense. Further, Crime Lab Division Special Order 86-6 indicates that pages of handwritten notes, marked as these are, "physical evidence exhibit", are considered part of the lab reports created with them which are kept within the Records Division file of the crime lab. The defendant argues that this policy does not indicate which documents are supposed to be produced as part of an official report or file pursuant to a request from the State's Attorney or the Public Defender, but only shows what documents are kept by the Records Division.

---

[5] It is somewhat ironic that plaintiffs rely on the sanctity of the State's Attorney's file to argue that the two copies of the Fish report in the file proves that Durkin tendered that report twice on August 4, 1986 in lieu of the Pulling report, but later argue that any page out of that file could have been tampered with by having its microfilm number erased so that it could be added to the file at a later date while appearing to be part of an earlier tender.

The defendants also contend that the plaintiffs are merely speculating that these handwritten notes are part of the Pulling report. However, it is undisputed that these handwritten notes have the same date as the Pulling report, and that they are all marked "physical evidence report." The defendants do not offer any other explanation for Special Order 86-6 or discuss the purpose or content of the handwritten notes at all. Thus, there is a question of fact regarding whether the five pages of handwritten notes should have been included as part of the Pulling report and whether the content of those notes are exculpatory. However, the defendant's possible failure to turn over part of the Pulling report may not be enough to defeat summary judgment, as we explain below.[6]

## Monell Analysis

---

[6] The parties also spend a significant amount of their summary judgment briefs arguing whether the Pulling report is exculpatory. As we explained above, the exculpatory nature of the two-page report is not significant, since we find that this report was in fact produced. Further, we do not need to decide whether the five pages of handwritten notes are exculpatory as well, since we hold that the City is not liable for any failure to produce this part of the report. However, we do note that none of the evidence adduced by the plaintiffs conclusively establishes that the Pulling report was exculpatory. The public defenders' affidavits do not take precedence over their deposition statements that they did not believe the Pulling report to be significant. Public defender Grzeca's affidavit was composed after his deposition, and he provides no reason for his sudden change of opinion. See Sullivan v. Conway, 157 F.3d 1092, 1096-97 (7th Cir. 1998). Further, public defender Nichols was questioned extensively about his affidavit at deposition, and concluded that the Pulling report was not significant to his client's defense. And for the same reasons we discount the expert opinion of Elizabeth Biestek above, we must also discount the expert report of Skip Palenik, a forensic microscopist, who opines that the Pulling report is exculpatory. As Palenik does not have any legal training, his opinion that the Pulling report is exculpatory is not helpful to the trier of fact and thus is irrelevant. See Daubert, supra, pg. 5.

Even though we find there is a question of fact about whether the City produced the entire Pulling report to the plaintiffs prior to their criminal trial, we may still grant summary judgment for the City if, as a matter of law, they cannot be held liable for such failure. With regard to the City's culpability, the plaintiffs have alleged a so-called *Monell* violation.[7] *Monell v. New York Dep't of Social Services*, 436 U.S. 658 (1978), sets forth the scenario under which a municipal entity may be found liable for the unconstitutional actions of its employees. Unless all of the factors of the *Monell* test are satisfied, no liability attaches; a municipality such as the City cannot be held liable under the doctrine of *respondeat superior*. *See Bd. Of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997).

The *Monell* test distinguishes individual violations perpetrated by local government employees – for which no municipal liability attaches – from those that can truly be said to be caused by an official municipal policy, so that the act can fairly be attributed to the government entity itself. Thus, a *Monell* violation requires three distinct elements. First, there must be unconstitutional conduct perpetrated by a municipal employee. *See Thompson v. Boggs*, 33 F.3d 847, 859 (7th Cir. 1998). Second, this conduct must be the result of a municipal policy. *Pembaur v. Cincinnati*, 475 U.S. 469, 479-80 (1986). Such a policy may be found in one of three ways: 1) the municipality has an express policy that, when enforced, causes a constitutional deprivation; 2) the

---

[7] The plaintiffs' complaint alleges *Monell* violations pursuant to both the 5th and 14th Amendments. However, the defendants point out, and the plaintiffs do not dispute, that the 5th Amendment only protects individuals from due process violations by federal employees, not state or municipal employees and entities as is alleged here. Thus, we disregard any allegations made pursuant to the 5th Amendment. *Reyes v. City of Chicago,* No. 98 C 1136, 1999 WL 160850 (N.D.Ill., March 16, 1999).

municipality has a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or 3) the constitutional injury was caused by a person with final policymaking authority. *Baxter v. Vigo County Sch. Corp.*, 26 F.3d 728, 734-35 (7th Cir. 1994) *cited in Vela v. Village of Sauk Village*, 218 F.3d 661, 665 (7th Cir. 2000). In this case, the plaintiffs do not clearly articulate which of the three types of policy scenarios is at issue here, but their allegations best fit the description of the second – a widespread, unwritten practice of unconstitutional behavior – in this case, a practice of not disclosing exculpatory material to criminal defendants. Thus, in order to demonstrate that such widespread practice provides the basis for municipal liability, the plaintiffs must show that the policymakers were responsible for a pattern of unconstitutional conduct.[8] *See Pembaur*, 475 U.S. at 481-84, and fn. 10.

Finally, there must be a causal link between the unconstitutional action and the plaintiff's injury. *Monell,* 436 U.S. at 694 (the municipal policy must be the "moving force" behind the alleged violation of constitutional rights). Finding municipal liability requires strict adherence to the stringent *Monell* standards, "[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability" (for which a municipality cannot be held liable). *Bryan County*, 520 U.S. at 410.

---

[8] As we explain below, the same reasons that the plaintiffs are unable to prove a widespread unconstitutional policy – namely lack of acquiescence and indifference by an individual with final policymaking authority – also provide the basis for a finding that the alleged unconstitutional behavior was not perpetrated by a municipal policymaker him or herself. Thus, to the extent the plaintiffs might argue that a superintendent or other manager of the police crime lab is a policymaker directly responsible for withholding the exculpatory materials, this argument must fail as well.

9

Assuming arguendo that the plaintiffs did not receive the entire Pulling report prior to their criminal trial and the five handwritten pages were exculpatory, they have adequately shown they suffered a constitutional violation by whatever City employee was responsible for turning over the report and failed to do so. *Brady v. Maryland*, 373 U.S. 583 (1963). However, they have failed to demonstrate that this failure, even if true, was pursuant to a municipal policy.

The plaintiffs make two arguments about the existence of a municipal custom that has risen to the level of an unwritten policy that caused their constitutional deprivations: 1) that the City's crime lab regularly withheld exculpatory evidence from African-American criminal defendants and in this case specifically withheld the Pulling report, and 2) that the City generally failed to train its laboratory employees in the correct techniques for recording and disclosing exculpatory evidence. The problem is that the plaintiffs base a significant portion of their argument in favor of a municipal policy on several erroneous legal premises. First, they point to Judges Castillo and Guzman's opinions denying the defendant's motions to dismiss various versions of the complaint as proof they have demonstrated a *Monell* violation. However, the plaintiffs confuse the standards necessary to survive a motion to dismiss - which does not address the legal merits of a case – with that for a motion for summary judgment. Judge Castillo denied the defendant's motion to dismiss because he found that the plaintiffs had adequately <u>pled</u> a *Monell* violation, not that they had proved one. In a motion to dismiss, the court must accept the allegations in the complaint – such as the allegation here that the City had a policy of withholding exculpatory evidence – as true. See *Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir. 1995). At the summary judgment

stage, the non-movant cannot rely on its pleadings or on conclusory allegations, but must come forth with credible evidence to prove the material facts, and the Court must assess these facts against the background of relevant case law. Fed.R.Civ.P. 56(c). Thus, Judges Castillo and Guzman's findings are not relevant to the current motion for summary judgment.

Next, plaintiffs argue that the police superintendent in charge of the crime lab is the policymaker responsible for the production of lab reports during criminal trials, and the failure to disclose the entire Pulling report can be attributed to him, either as a directly acting policymaker or as an individual who was aware of the widespread unconstitutional practices and showed deliberate indifference to them. Plaintiffs set forth nearly two pages of boilerplate legal theory about how to assess whether an individual municipal employee is a policymaker, and speculate that various managers and superintendents of the police crime lab were thus policymakers. However, plaintiffs ignore the uncontradicted case law of the Seventh Circuit that has consistently held that police superintendents are <u>never</u> policymakers for the purpose of assigning municipal liability. *Latuszkin v. City of Chicago*, 250 F.3d 502. 505 (7th Cir. 2001); *Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992). Instead, only the City Council and Chicago Police Board are imbued with authority to make policy for the City of Chicago Police department.[9] *Id.*

---

[9] In light of clear Seventh Circuit precedent regarding police department policymakers, neither plaintiffs' speculation that various superintendents should qualify for policymaker status, nor crime lab director Paul Gall's testimony that he was in charge of the entire crime lab is sufficient to establish that they were policymakers under a *Monell* analysis.

11

The plaintiffs have failed to adduce competent evidence that either the City Council or the Chicago Police Board either perpetrated unconstitutional policies with regard to exculpatory evidence, or were aware that such actions were occurring and showed deliberate indifference to them. Instead, the plaintiffs argue that various police superintendents have recognized the need for more or different training of crime lab employees, and ignored this need, and also that the problems related to the crime lab are well documented, and yet no corrective action has been taken. We do not need to address the alleged policymaking authority of each of the individuals named by the plaintiffs because none of them are members of the City Council or Chicago Police Board. Thus, the plaintiffs' speculation that individuals such as the Police Superintendent as well as the Deputy Superintendent of Technical Services Matthew Rodriguez and Director of the Crime Lab Paul Gall had final policymaking authority sufficient to prove a *Monell* violation is irrelevant.

The plaintiffs' next argument is that the City Council (which does have policymaking authority with respect to the crime lab), was on notice of the deficiencies in the crime lab, but remained deliberately indifferent to them. The bulk of plaintiffs' proof of both the problems with the crime lab and the policymaker's knowledge of the problems is the fact that various audits were conducted of the crime lab, some of which revealed flaws in the lab's procedures. Further the plaintiffs point out that several civil cases occurring at the same time as Wardell and Reynolds' criminal case resulted in convictions being overturned because of errors made by the crime lab.

In order to demonstrate a *Monell* violation based on alleged problems with the crime lab for which the City may be held responsible, the plaintiffs must prove – not

12

simply allege or speculate – that the policymakers were deliberately indifferent to the problems. *Bryan County*, 520 U.S. at 410. In this case, the plaintiffs' evidence is either irrelevant to the question of indifference, or actually demonstrates that the City Council was trying to correct any crime lab deficiencies.[10]

First, the audits mentioned by the plaintiffs and attached to their statement of undisputed facts were undertaken for the purpose of assessing the narcotics section of the crime lab, not the trace unit section at issue here. Further, as the plaintiffs themselves point out, this audit was conducted at the request of the police superintendent, "in order to review and address the [crime lab's] need in `maintenance of the chain of evidence, quality control and training, and staff development'" (Pl. Resp. at 10). Thus, the evidence shows that, far from being indifferent to any potential crime lab problems, the City was taking affirmative steps to correct any deficiencies. The fact that their proposed corrections may not have been completely effective at the time of the Wardell and Reynolds' trial does not rise to the level of a *Monell* violation. *See Wilson v. City of Chicago*, 6 F.3d 1233, 1240 (7th Cir. 1993).

Next, plaintiffs speculate without any evidence that Rodriguez and Gall, after reviewing the audits, failed to implement any corrective measures, and that when deposed thirteen years later, Gall could not even remember that an audit had taken place. As explained above, the audits in question focused on a wholly separate section of the crime lab. No significance can be attributed to Gall's failure to remember this

---

[10] The fact that at least the two-page Pulling report was turned over also belies any argument that the City had a policy of withholding exculpatory evidence. The plaintiffs argue that both parts of the report, the typed portion as well as the handwritten portion, had exculpatory information. Thus, if the City had an unwritten policy of failing to turn over exculpatory materials, it would not have turned over the typed report either.

13

audit years later, and it certainly does not demonstrate deliberate indifference to any problems in the crime lab trace unit. Further, the plaintiffs adduce evidence that Gall was in fact hired in 1983 to "clean up" the crime lab, belying their argument the lab had an unwritten practice of failing to turn over exculpatory evidence to which police department policymakers were indifferent. Thus, plaintiffs have not demonstrated that an unwritten crime lab practice was the "moving force" behind the plaintiffs' alleged constitutional injuries.

For the same reasons, the plaintiffs have failed to demonstrate that there was any failure by the Chicago police department to train its employees in the proper methods for dealing with exculpatory lab reports. In order to prove that policymakers are liable for their failure to train, the plaintiffs must demonstrate a "deliberate indifference" to the rights of individuals so that any shortcoming can be said to rise to the level of a policy or custom. See *Pembaur*, 475 U.S. at 483-84. For the reasons we explained above, there is no evidence that the City showed deliberate indifference to individuals whose criminal cases were being processed in the crime lab's trace unit.[11]

Because the plaintiffs are unable to demonstrate that their alleged constitutional violations were the result of municipal policy, their *Monell* claim must fail. We do not even need to reach the third part of the *Monell* test, that there must be a direct causal

---

[11] The plaintiffs' citations to several cases that overturned convictions because of crime lab deficiencies cannot save their case. Most of the alleged "negative publicity" about the crime lab from the *Willis* and *Jones* cases occurred after the plaintiffs' criminal trials, and thus cannot be evidence that policymakers had knowledge prior to trial that there were crime lab deficiencies. In any event, plaintiffs merely speculate that the policymakers knew about and ignored general bad publicity, they do not identify any of it with specificity or explain how this demonstrated an awareness of problems in the crime lab's trace unit at the time of the Wardell and Reynolds' trial.

link between the alleged policy and the plaintiffs' injury. However, we do note that much of the evidence the plaintiffs adduce in this regard cannot be considered. First, the affidavit of a juror in the criminal trial that she believes the Pulling report to be exculpatory violates Fed. R. Ev. 606(b) and cannot be considered. Even if it could be considered, the opinion of one juror that the Pulling report would have changed her mind about the verdict is not credible evidence that the jury would have returned a not guilty verdict. It is too speculative of a theory which amounts only to a mere probability of causation, not the high likelihood that the constitutional deprivation caused the plaintiff's injury as required by case law. *Bryan County*, 520 U.S. at 412.[12]

The last remaining matter we must decide is the plaintiffs' state law claim of intentional infliction of emotional distress stemming from the City's alleged failure to turn over the Pulling report. Since we are dismissing all of plaintiffs' federal claims, we decline to retain jurisdiction over their state law claim. 28 U.S.C. § 1367(c)(3), *see also, Wright v. Associated Ins. Cos., Inc.*, 29 F.3d 1244, 1252 (7th Cir. 1994) ("when all federal claims are dismissed before trial, the pendent claims should be left to the state courts.")

---

[12] The plaintiffs have also filed a motion to strike the affidavit of Maria Pulling attached to the City's reply brief on the ground that it is being used to blindside the plaintiffs at a time when they cannot response. Without assessing whether the Pulling affidavit is in response to a portion of the plaintiffs' Response brief, we note that we did not consider it in deciding this motion, and for that reason, deny the motion to strike.

Defendant's motion for summary judgment is granted in its entirety, and plaintiffs' motion to strike the Pulling report is denied as moot. The remaining pending motions, both those which are fully briefed and those which are not, are also denied as moot. It is so ordered.

_____
Michael T. Mason
United States Magistrate Judge

Date: <u>October 31, 2001</u>